### STATE EX REL. TOWNSHIP OF COPLEY AND OTHERS v. VILLAGE OF WEBB AND OTHERS.

83 N. W. (2d) 788.

June 7, 1957—No. 36,516.

*Nelson & Clemmensen* and *Bruce N. Reuther,* for relators.
*Harry H. Peterson, O. E. Lewis,* and *George A. Lewis,* for respondents.

MATSON, JUSTICE.

Original proceedings by writ of quo warranto challenging the legality of the incorporation of the village of Webb.

The sole issue is whether the territory included in such village is *so conditioned as properly to be subjected to village government.*

The referee appointed by this court, after an extended hearing and after a view of the locus in quo with counsel, concluded that the territory is not conditioned for village government and that the purported incorporation of the village is null and void. These conclusions were based on findings that: (1) There is no population nucleus on the platted portions of the territory; (2) the unplatted territory is not suburban in character and is not likely to become so in the near future; (3) there is not such a natural connection between the platted and unplatted areas involved as creates a community of interest among the residents as to desire and need for municipal services; and finally, (4) that the incorporation of the village will deprive the township of Copley of approximately 17 percent of its tax revenue, which deprivation will seriously curtail and handicap necessary township functions and government.

In passing on the evidence it is to be borne in mind that, although the burden of proof—without the benefit of any presumptions in favor of the propriety of the incorporation—rests upon the incor-

porators of a village,[1] their judgment is not to be lightly set aside unless the evidence clearly demonstrates that the area to be incorporated is not suburban in character and is not likely to become so in the near future, or that no community of interest exists between the inhabitants of the proposed village.[2] The findings of a referee appointed by this court have the effect of a special verdict[3] which is entitled to the same weight as a general verdict and is thus final upon appeal where the evidence is conflicting.[4]

We turn to the evidence. The territory of the proposed village consists of 18.40 acres of platted land and 262.20 acres of unplatted land or a total of 280.60 acres. The platted area is divided into five subdivisions and contains slightly over half of the total population of 212 people. The remaining people are in the unplatted area which has a population density of 0.4 persons per acre.

The territory is bounded on the east by the village of Bagley. Five-sevenths of the land area is located north of U. S. Highway No. 2 and the remaining portion is located on the south side of the highway. Two of the subdivisions of the platted area are north of the highway, one facing east toward the village of Bagley from which it is separated only by a street of the latter village. The other three subdivisions of platted land front on the south side of the highway. None of the subdivisions is contiguous to another since all are separated by intervening unplatted land.

A map of the proposed village territory (relators' exhibit 1) is reproduced herewith for reference. The unplatted area is well described by the referee in his memorandum as follows:

"* * * The north half of the Northwest quarter of Section 30 is with-

---

[1]State ex rel. Burnquist v. Village of North Pole, 213 Minn. 297, 303, 6 N. W. (2d) 458, 461.

[2]State ex rel. Northern Pump Co. v. Village of Fridley, 233 Minn. 442, 451, 47 N. W. (2d) 204, 210; State ex rel. Burnquist v. Village of Leetonia, 210 Minn. 404, 298 N. W. 717; State ex rel. Hilton v. Village of Kinney, 146 Minn. 311, 178 N. W. 815.

[3]State ex rel. Town of Stuntz v. City of Chisholm, 199 Minn. 403, 273 N. W. 235; State ex rel. Northern Pump Co. v. Village of Fridley, *supra*.

[4]State ex rel. Northern Pump Co. v. Village of Fridley, *supra*; Blume v. Ballis, 207 Minn. 393, 291 N. W. 906.

out buildings or roads and is composed of low or swamp land with light timber areas thereon and some grassland including some that has been clovered; this area also contains a bulldozed area and some unworked field. The Southwest quarter of the Northwest quarter of Section 30 consists of some brushland and some that has been used for farming. This area contains a set of farm buildings. The Southeast quarter of the Northwest quarter consists partly of timber land and some that has been planted in clover. The Southwest quarter of the Northeast quarter of Section 30 has several acres of pasture land and the rest is apparently lightly timbered. It is significant that, except for a strip of land along U. S. Highway No. 2, there are no roads or means of public access to any part of the Northwest quarter of Section 30, which has hereinbefore been discussed. There are no platted areas in this whole Northwest quarter section of 160 acres, which constitutes over one-half of the total area to be incorporated in the Village of Webb. The very few buildings that exist in the entire Northwest quarter section are located near U. S. Highway No. 2 and are shown on Relators' Exhibit 1. It should be observed that some of such buildings are connected with a gas station and others with a concrete block plant, but neither of which businesses contribute anything to a necessary community of interest which is essential to a valid incorporation. The evidence discloses that these establishments to a very large extent serve areas away from and not a part of the Webb community. And now proceeding to the unplatted area to the south of U. S. Highway No. 2; the Northwest quarter of the Southwest quarter of Section 30 is predominantly hayland and timber and contains one fairly good building and a few small buildings in the nature of shacks or sheds. The unplatted portion of the Northeast quarter of the Southwest quarter is hayland and timbered, with no buildings in the south half thereof at all. This area also contains some gravel pits."

The village has a number of business establishments, all of which are located along the highway; they include a general store, a motel, a concrete-block company, a lumberyard, a gas station with a restaurant, which operates six months of the year, an auto-wrecking yard, and a trailer parking area. The village has no schools, churches, libraries, post offices, drugstores, clothing stores, banks, or civic organizations.

■ The statute authorizing the formation of a village is M. S. A.

# RELATORS' EXHIBIT 1

# VILLAGE OF WEBB, MINNESOTA

## CLEARWATER COUNTY
### COPLEY TOWNSHIP

ENERAL LAYOUT OF SUB-DIVISIONS WITHIN A PART OF SECTION 30 T. 147 N. R.37 W.

SCALE 1"= 150'    A.L. BYE REG. ENGINEER & LAND SURVEYOR

AREA

N.W. 1/4
30

FIELD

TIMBERED AREA

LOWLAND

PASTURE

FIELD

S.W. 1/4 OF N.E. 1/4
SEC. 30

 PASTURE

OF N.W. 1/4
C. 30

LARSONS SUB-DIVISION

STREET

CHOLTAS SUB-DIVISION

VILLAGE OF BAGLEY

VILLAGE OF BAGLEY

1/16 COR-IRON MARKER INPL.

CENTER LINE T.H. NO 2

HIGHWAY R/W LINE
CENTER SEC. 30

VILLAGE OF BAGLEY

OBSON'S SUB-DIVISION

TIMBERED AREA

S.W. 1/4

RAILROAD

CLEARWATER RIVER

412.011, subd. 1, and it provides that:

"Territory containing a resident population of not less than 100 persons may become incorporated as a village in the manner hereinafter prescribed if it is not included within the limits of any incorporated municipality. Such territory shall include land which has been platted into lots and blocks in the manner provided by law and may include unplatted lands adjoining such platted area *if so conditioned as properly to be subjected to village government.*" (Italics supplied.)

In State ex rel. v. Minnetonka Village, 57 Minn. 526, 533, 59 N. W. 972, 974, 25 L. R. A. 755, 759, this court, in interpreting an earlier version of § 412.011, subd. 1, held that the statutory test of whether incorporated territory is so conditioned as properly to be subjected to village government embraces three basic essentials to a valid incorporation, namely, (1) that the platted portion of the lands contains *a compact center or nucleus of population,* (2) that the adjacent *unplatted lands are suburban in character,* and (3) that the unplatted lands have with the platted portions *a unity of interest* in the maintenance of a village government.

█ Although this three-factor formula embraces the basic essentials, it provides no inflexible rule of application and each case must be determined according to its own peculiar facts.[5] The adaptability of the formula to meet different and changing conditions has been illustrated by our decisions. In the Minnetonka Village case, Mr. Justice Mitchell recognized that land which is essentially rural in character has no fitness for village government and absolutely no community of interest with respect to the purposes for which such a government is designed. Subsequently, the court held that different factual considerations exist where the unplatted land is nonagricultural and is used for mining purposes.[6] This distinction between mining and agricultural lands relaxed the requirement for incorporating mineral lands primarily on the

---

[5]See, State ex rel. Simpson v. Village of Alice, 112 Minn. 330, 127 N. W. 1118; State ex rel. Smith v. Village of Gilbert, 127 Minn. 452, 149 N. W. 951; State ex rel. Burnquist v. So-Called Village of St. Anthony, 223 Minn. 149, 26 N. W. (2d) 193; 38 Minn. L. Rev. 646.

[6]State ex rel. Simpson v. Village of Alice, 112 Minn. 330, 127 N. W. 1118.

basis of the needs of the resident miners.

Again the court in State ex rel. Burnquist v. So-Called Village of St. Anthony, 223 Minn. 149, 26 N. W. (2d) 193, recognized the change in the requisite conditioning for village government of both platted and unplatted lands in large metropolitan areas where large portions of the land are devoted to light or casual farming and a vast majority of the inhabitants are engaged in urban occupations. We need not here explore the controlling factors involved in each of the foregoing decisions. It is enough to recognize that the three-factor formula has brought different results according to the character of the unplatted land, its use, and the needs of its inhabitants, and that, therefore, decisions involving mining and metropolitan areas are of little help in determining the problems that arise in a primarily agricultural community.

The referee concluded that the incorporation of the village of Webb is invalid because of failure to satisfy any of the basic essentials of the three-factor formula. Whether the referee was correct in holding that the platted portions did not contain the requisite compact center or nucleus of population we need not determine[7] since there is adequate evidence to sustain the referee's other conclusions that the unplatted land is not suburban in character and that there is no community of interest between it and the platted areas. It is to be borne in mind that the setting of the proposed village is in an area which is primarily agricultural as distinguished from mining or metropolitan areas and that decisions applying to the latter are not necessarily controlling.

There is no dispute regarding the character of the unplatted lands. The vast percentage of the territory sought to be incorporated is uninhabited, being either timberland or unworked fields. There are no roads which render it easily accessible to the populated areas. This being so, a finding that it is not suburban in character at the present time is compelled.[8] Nor can it be said that there is any indication that it will become so in the reasonably foreseeable future. In this regard the situation is clearly distinguishable from that in State ex rel. Northern Pump Co. v. Village of Fridley, 233 Minn. 442, 47 N. W. (2d) 204. In that

[7]See, State ex rel. Childs v. Village of Fridley Park, 61 Minn. 146, 63 N. W. 613.

[8]See, State ex rel. Childs v. Village of Fridley Park, *supra.*

case there was abundant evidence of a rapidly growing population; 70 percent of the families had moved into the area within the preceding 3 to 5 years. New homes were being built at a rapid rate. In contrast we have the situation in Webb where no new homes have been constructed in the past three years. Fridley was located near the Twin Cities and the growth was attributable to the movement of former city dwellers to the suburban areas. Obviously, that situation is not present in the instant case.

The referee also concluded that there was no community of interest among the people of the area. In past cases the court has tended to speak of this requirement solely in terms of a unity of interest between the residents of the platted areas and those on the unplatted areas.[9] Implicit, however, in these statements is the assumption that there is a community of interest existing among those people residing solely on the platted areas.

Since a large percentage of the unplatted land here is unpopulated, obviously the requisite community of interest cannot exist between these areas and the platted portions.[10] Furthermore, there is no indication that such interest will develop in the foreseeable future since there is no evidence tending to show that these areas will be needed as residential sites.

Even as to the people living in the vicinity of the "nucleus of population," the record is barren of evidence suggesting a unity of interest. The referee concluded, and the evidence supports his conclusion, that almost all of the people gravitate to Bagley as the source of their needs for goods and services. A significant expression of an existing community of interest is a desire for the services which flow from the maintenance of village government. Perhaps the best evidence of the complete lack of such an interest in the village of Webb can be found in the activities of the village council. Although the council had been in existence for over a year and one-half, it collected no taxes and has furnished no municipal services; nor is there any evidence of a demand for

---

[9]See, State ex rel. Hilton v. Village of Kinney, 146 Minn. 311, 178 N. W. 815.

[10]See, State ex rel. Burnquist v. Village of Leetonia, 210 Minn. 404, 298 N. W. 717.

any such services from the population. In addition the village has no civic groups or organizations which are, after all, nothing more than the tangible evidence of an existing community spirit or interest.

While it is true that an established business or commercial center is not essential to a valid incorporation, at least in a metropolitan area,[11] the referee in the instant case properly took cognizance of the fact that there were no schools, post offices, churches, clothing stores, drugstores, banks, barber shops, or motion-picture theaters in the newly incorporated area. Although the absence of a business center will not of itself defeat an incorporation if all the other necessary conditions are fulfilled, it does become a significant factor in cases like the present one where there is no evidence of any other form of a community of interest. Since there was no other manifestation of a unity of interest, the presence of a business center would have been indicative to some extent of a common focal point for the interest of the population.

The findings and conclusions of the referee are affirmed. Let a writ of ouster issue.

So ordered.

MR. CHIEF JUSTICE DELL took no part in the consideration or decision of this case.

---

[11]See, State ex rel. Burnquist v. So-Called Village of St. Anthony, 223 Minn. 149, 26 N. W. (2d) 193.